IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-CT-3140-BO

| | |
|---|---|
| JOHN CLYDE BRITT, JR., <br> Plaintiff, | ) <br> ) <br> ) |
| v. | )     **ORDER** |
| MATTHEW A. RAYMES, et al., <br> Defendants. | ) <br> ) <br> ) |

John Clyde Britt, Jr., filed this action pursuant to 42 U.S.C. § 1983. Plaintiff's claims arise from an incident on October 2005 during the execution of a search warrant and his subsequent arrest. Amended Compl., Facts. Now before the court is a motion for summary judgment filed by defendants Matthew A. Raymes, Jeremy Hughes, Marcus Anderson, Greg Moore, David Borresen, Brian Thomplins, and Paul Spiegler [D.E. 92]. All defendants are law enforcement officers employed by Cumberland County Sheriff's Department and members of the Special Response Team, with the exception of Jeremy Hughes who is employed by the Cumberland County Sheriff's Department and a drug agent, not a member of the Special Response Team. Amended Compl., Parties.

A brief outline of the procedural history of the case is helpful. On October 17, 2007, plaintiff, acting pro se, filed his complaint with the court [D.E. 1]. Multiple filings then occurred, and on March 18, 2009, the court entered an order denying defendants' first motion to dismiss [D.E. 37]. On June 22, 2009, defendants filed a motion for summary judgment [D.E. 48]. On March 26, 2010, the court entered an order which dismissed all but two claims, excessive force in violation of the Fourth Amendment in the execution of a search warrant of Britt's residence which resulted in Britt's shooting wherein he sustained injuries and conspiracy arising from the alleged excessive force [D.E. 58]. Thereafter, on January 6, 2011, the court

appointed North Carolina Prisoner Legal Services to represent plaintiff [D.E. 62]. On December 1, 2011, after some discovery had been undertaken, defendants filed a second motion for summary judgment [D.E. 77]. On March 15, 2012, this summary judgment motion was dismissed without prejudice pending resolution of a motion to appoint a ballistics expert [D.E. 83]. The following day, the expert was appointed [D.E. 84]. On July 25, 2012, an amended complaint was filed and a voluntary dismissal as to defendant John Newland was taken [D.E. 87 and 88]. On January 14, 2013, a third summary judgment motion was filed by defendants [D.E. 92]. On February 4, 2013, a response in opposition to the motion for summary judgment was filed by plaintiff [D.E. 95]. On February 6, 2013, the court held a hearing on the motion for summary judgment. On March 8, 2013, Britt filed a pro se letter supplementing the response in opposition to summary judgment [D.E. 98]. In this posture, the matter is ripe for determination.

Factual Allegations

> The court has previously held:
>
> Plaintiff was targeted as a major trafficker of cocaine by state and local law enforcement agencies, including the Cumberland County Sheriff's Office and Cumberland County Bureau of Narcotics (CCBN). After a controlled buy for marijuana from plaintiff by a confidential informant on October 11, 2005, the Cumberland County Sheriff's Office decided to execute a search warrant at plaintiff's home at 1476 Eberhardt Road, St. Pauls, Cumberland County. All indications were that plaintiff possessed weapons such as an AK-47 assault rifle and .45 caliber pistol. Plaintiff's residence was known to be in a rural and relatively remote location of the county. The warrant indicated the mobile home and surrounding area created danger because of the mobile home's remoteness and because aggressive dogs were known to reside there.
>
> The search warrant authorizing the search was issued by a duly-authorized judicial officer at 11:00 a.m. on October 14, 2005. After the search warrant was obtained, the Cumberland Sheriff's Office Special Response Team ("SRT") conducted surveillance of plaintiff's residence. SRT proceeded to plaintiff's residence in an unmarked Sheriff's Office van. At approximately 9:00 p.m., the order was given for SRT to move in and serve the search warrant.

Shortly, before 9:30 p.m., the entry team approached the bottom of the steps leading up to the front of plaintiff's mobile home. Defendant Deputy Matthew Raymes was "on point" and leading the formation. At the same time inside the mobile home, although plaintiff states it was after 8:00 p.m. not 9:30 p.m., plaintiff contends he thought a rattlesnake was biting his wife's dog. Therefore, he retrieved his AK-47 assault riffle, flashlight, cigarettes, a drink, and opened the door to evaluate the scene. He states he opened the door, stepping between the front metal door and screen door and encountered the Cumberland Sheriff's Office Special Response Team ("SRT"). He alleges he was holding the rifle "by the barrel, the butt plate on the floor in a non-firing position . . . not presenting an imminent threat to [defendants'] person and should have been given the opportunity to put the gun down." He alleges he was immediately shot once in the arm and fell to his knees. He alleges the shot was fired by Defendant Raymes. Britt states the open fire threw the weapon backwards and out of his reach. Next, Britt states Defendant Raymes came up the stairs of the mobile home and shot downward at point blank range shooting plaintiff through his bowels and into his thigh.

Britt alleges three infants, his niece and her fiancé were also inside the house and that multiple shots were fired. Plaintiff states after this occurred, a search ensued resulting in the finding of no money or drugs. He asserts he was placed in some type of handcuffs after being shot as defendants attempted to cover-up the situation by some officers leaving to retrieve the warrant, reloading the gun of Officer Raymes, and waiting over an hour to call for medical assistance.

Officer Raymes states when the door of the trailer opened he yelled "Sheriff's Office, Search Warrant." He states Britt was "holding an assault rifle in a low ready position." Raymes then gave a verbal command to get down. He discharge his weapon only after a verbal command because Britt did not comply with the command, but stepped backward out of his line of sight while holding the AK-47 in a threatening position. Raymes perceived an immediate threat of deadly force and asserts he fired one shot, consisting of a three round burst, which hit plaintiff. The law enforcement affidavits attached to the summary judgment motion also generally support Raymes' version of the October 14th events.[1]

Tactical medics were part of the police force and organized raid when the shooting occurred. These individuals provided medical treatment within minutes of the shooting. They assessed the gunshot wounds, including the determination that

---

[1] There are numerous affidavits from the officers. Each generally supports Raymes's affidavit, some more specifically and some in more general terms, depending on the vicinity of that officer to the shooting. As discussed in the affidavits, different officers were stationed or placed in different positions on plaintiff's property.

3

Britt suffered no wounds in his back. To do this, the medics cut off his clothes to search for the bullet wounds. The medics placed Britt on oxygen and bandaged the wounds with an "occlusive dressing that sealed the wounds and prevented air from being sucked into suspect Britt's chest and abdomen." The medics bandaged the forearm, upper arm, splinted the fractured right arm and started an IV in addition to attaching a cardiac monitor.

The EMT documents provided in support of defendants' motion for summary judgment state the call regarding the shooting was received at around 9:20 p.m. The EMT was dispatched and encountered an individual suffering from multiple gun shot wounds. An ambulance was dispatched from Cape Fear Valley Medical Center to the scene at approximately 9:30 p.m. and arrived at 9:52 p.m.

Upon arrival by the EMT, plaintiff was already on oxygen and the medics were in the process of splinting plaintiff's broken right arm. Britt was transferred to a backboard, a stabilizing collar was placed around his neck, and additional IVs were started to stabilize his blood pressure. The ambulance left the scene carrying plaintiff at 10:06 p.m. Plaintiff arrived at Cape Fear Medical Valley Center at approximately 10:36 p.m.

In this case, plaintiff sought and received a court appointed expert in forensic pathology and gunshot wounds, Dr. Vincent Di Maio. The expert's opinion reviewed the testimony of plaintiff and defendants, the medical records, the medics statements, testimony of Special Agent Jeffries of the North Carolina State Bureau of Investigation, as well as reports, documentation, and diagrams made as a result the shooting. He summarized part of the records not previously summarized by the court as follows:

> SA Jeffries of the North Carolina State Bureau of Investigation was notified of the shooting. He arrived at the scene at approximately 10:56 pm and noted three spent .45 ACP shell casings on the ground to the right of the front step. There was a large amount of broken glass covering the front steps, the landing and inside the residence at the front door. Lying in the living room near the front door was a Romanian AK-47 type 7.62 X 39 rifle with 9 cartridges in the magazine and one in the chamber.

> Mr. Britt was transported to Cape Fear Valley Medical Center. He was a patient there from 10/14/2005 to 10/24/2005. During this time, he had repair of his injuries including a laparotomy with an appendectomy and a small bowel resection. He had a

4

second laparotomy to see if there were any postsurgical complications but this was negative.

The Emergency Department Report of 10/14/2005 describes four gunshot wounds. There was an entrance wound in the right upper chest below his right clavicle; a second entrance wound around the umbilicus and entrance and exit wound in the right upper arm near his axilla with deformity of the humerus and an entrance wound of the right forearm. These are depicted in a diagram on page 3533.

There was a history of diabetes mellitus, type II; hypertension; cocaine abuse; alcohol abuse and emphysema. A progress note on the day of admission, 10/14/2005, indicates that Mr. Britt had three gunshot wounds:

> 1. A thru and thru wound of the anterior chest, axilla and right humerus with fracture;
> 2. A thru and thru wound of the right forearm; and a
> 3. A periumbilical wound of the abdomen with the bullet going towards the right thigh

Urine screen on a specimen collected on 2235 hrs on 10/14/05 was positive for cocaine and benzodiazepines. Dr. Christian Montagano stated that no benzodiazapam had been administered in the emergency room.

A review of the medical records reveals a consultation report of 10/14/2005 by Dr. James W. Snead. He states that there was an entry wound in the right chest with an exit wound in the right axilla, a reentry wound of the right upper arm and an exit wound of the lateral aspect of the upper arm. The bullet produced a midshaft fracture of the humerus. There was a second soft tissue wound of the right forearm. In his deposition, Dr. James Snead stated that in regard to the wound of the right upper arm, which resulted in a mid-shaft fracture of the humerus, it appeared from looking at the chart and from what he remembered that the entrance wound was in the front and the exit wound was in the back.

A consultation on 10/14/2005 by Dr. Paul J. Nordness mentions a linear soft tissue bullet abrasion to his right chest. In his deposition of October 3, 2011, Dr. Nordness stated that the abdominal bullet went into the upper right thigh. It was his opinion, that a single bullet produced a thru and thru wound of the chest, exited and immediately entered the right upper arm. He felt that it was most probable that Mr. Britt had been hit by three bullets.

Report of Dr. Vincent Di Maio, pp. 2 - 5.

5

From the review of the entire record, Dr. Di Maio concluded:

> Based on the aforementioned facts, it is my opinion that, in all medical probability, the account of the shooting as given by Corporal Matthew A. Raymes is the correct account of the incident. Mr. Britt claimed that he was standing in the doorway when he was shot by Cpl. Raymes while the latter was standing in the yard in front of the steps. Mr. Britt claims that he was then hit by two bullets, one perforating his right forearm. The other bullet went through his right chest, exited and perforated his right upper arm fracturing his humerus. This bullet followed a downward path. Cpl. Raymes fired steeply upward. There is no way he could have produced downward bullet path. According to Mr. Britt's account, the deputy then stood over him and fired a second three round burst. The deputy would have had to been almost on top of Mr. Britt at the time. There was no evidence of close range firing in the medical records and one would assume that he would have been stuck by at least another shot at the time due to the close range.

Id.

Discussion

### i. Summary Judgment

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A mere scintilla of evidence supporting the case is not enough. Anderson, 477 U.S. at 252. The court construes the evidence in the light most

6

favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. Matsushita Elec. Indus. Co., 475 U.S. at 586-87.

### ii. Qualified Immunity

Defendants assert qualified immunity. Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012); Pearson v. Callahan, 555 U.S. 223, 231–32 (2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Reichle, 132 S. Ct. at 2093; Messerschmidt v. Millender, 132 S. Ct. 1235, 1244–45 (2012); Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011); Pearson, 555 U.S. at 231–32.

The court must ask two questions to determine whether qualified immunity applies. See, e.g., Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 232; Evans v. Chalmers, No. 11-1436, 2012 WL 6554846, at *5 (4th Cir. Dec. 17, 2012); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010); Unus v. Kane, 565 F.3d 103, 123 n.24 (4th Cir. 2009); Miller v. Prince George's Cnty., 475 F.3d 621, 626–27 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009). The court decides which question to address first. Pearson, 555 U.S. at 236; see Reichle, 132 S. Ct. at 2093; al-Kidd, 131 S. Ct. at 2080. The court must determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. The court also must determine

7

"whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. (quotation omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." al-Kidd, 131 S. Ct. at 2083 (alterations in original) (quotations omitted); see Reichle, 132 S. Ct. at 2093; Anderson v. Creighton, 483 U.S. 635, 640 (1987). The United States Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083; see Reichle, 132 S. Ct. at 2093. Defendants are entitled to qualified immunity if the answer to either question is "no." See, e.g., al-Kidd, 131 S. Ct. at 2080; Miller, 475 F.3d at 627; Bostic, 667 F. Supp. 2d at 606.

### iii. Excessive Force

Under the Supreme Court's ruling in Graham v. Connor, a court must review an excessive force claim under the Fourth Amendment and its "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985) (internal quotation marks omitted)). Because such a test does not lend itself to a bright

8

line rule, the court must consider the "totality of the circumstances" when assessing the reasonableness of force used by an officer. Garner, 471 U.S. at 8-9. The court should view the totality of the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

Furthermore, "[a] mistaken use of deadly force . . . is not necessarily a constitutional violation under the Fourth Amendment: a mistaken understanding of facts that is reasonable in the circumstances can render a seizure reasonable under the Fourth Amendment." Culosi v. Bullock, 596 F.3d 195, 200-201 (4th Cir. 2010). The use of deadly force by a police officer is reasonable when the officer has probable cause to believe the individual poses an immediate threat of serious physical harm to the officers and others. Garner, 471 U.S. at 11. If the individual poses no immediate threat, the use of deadly force is not justified. If the individual "threatens the officer with a weapon . . . deadly force may be used if necessary . . . and if, when feasible, some warning has been given." Id. at 11 - 12.

In its prior order the court cited to a Fourth Circuit opinion, albeit unpublished, which held that "the mere presence of a weapon is not sufficient to justify the use of deadly force." Order of March 26, 2010 p. 7-8 (citing Pena v. Porter, 316 Fed. Appx. 303, 312 (4th Cir. 2009)). In Pena, the plaintiff was awakened at night by a noise and came to the door with a gun held down because he believed that "a fox or other predator was raiding his chicken coop." Pena 316 Fed. Appx at 311-312. At the door he encountered the police who failed to identify themselves and shot him multiple time as well the officers firing "an additional fourteen shots into the trailer." Id. At 307. The court in Pena stated "the police do not have the unfettered authority to shoot any member of the public carrying a gun or other weapon." Id. at 311. Further,

9

defendants "had no probable cause to believe that [plaintiff] was dangerous other than the fact that he possessed a weapon." Id. The Fourth Circuit also noted that plaintiff had a "perfectly reasonable" rationale for holding the rifle and that this "should have been apparent to [defendants] at the time of the shooting." Id. at 312. Because defendants did not identify themselves as law enforcement officers before plaintiff stepped on to the porch, the Fourth Circuit determined that it was unreasonable for defendants to conclude that plaintiff's "decision to arm himself was a sign of hostility to police." Id. at 312 n. 8.

This court is again presented with a motion for summary judgment. At this point, the summary judgment is in a different posture from that of March 25, 2010, when the first summary judgment motion was denied "[g]iven the conflicting factual allegations about the position of the gun, the warnings issued, and the actions of both the officers and the plaintiff." Presently the case is before the court with counsel, on an amended complaint, and an opinion from an expert whom has throughly and extensively reviewed the case. The summary judgment motion encapsulates and argues all the evidence in its present form. Defendants' qualified immunity defense remains viable. See Order of March 25, 2010 (citing Schultz v. Braga, 455 F.3d 470, 479 (4th Cir. 2006)).

The objective evidence before the court negates plaintiff's factual allegations. See, Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) (objective evidence is to be credited on summary judgment; when "the record contains an unchallenged videotape capturing

10

the events in question, [the court] must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape"); Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) ("[c]onclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the non-moving party's] case.").

The evidence is that plaintiff was a known criminal, in a dangerous area, known to possess weapons. On October 14, 2005, defendants were approaching the trailer to serve a legal warrant obtained earlier that day. Surveillance had been underway throughout most of the day, and the execution of the search warrant was planned and carefully organized, having assembled a Special Response Team due to the dangerousness of the situation. As the Special Response Team neared the door in execution of the planned approach, plaintiff opened the door carrying an assault weapon in what the officers perceived to be a threatening position. Defendant Raymes yelled "Sheriff's Office, Search Warrant." He also yelled, "get down." Plaintiff who had cocaine in his system may not have heard the warning, but recognized the defendants as law enforcement. He did not get down, and Officer Raymes, perceiving an immediate threat, fired one three round burst. The shot from Officer Raymes' gun occurred outside the trailer and not at a point blank range. Affidavit of William S. Martin, ¶ 7 (noting three spent shell casings on the ground near the steps). While plaintiff attempts to argue that Officer Raymes moved his gun from one setting (the three round burst) to another (the single fire setting) and then fired one single shot at close range, there is no evidence to support this except plaintiff's unsupported allegation.[2] The gun was collected from Officer Raymes by the SBI shortly after the incident

---

[2]Plaintiff's highly speculative allegation that Raymes inserted a bullet into his clip or magazine in order to conceal a forth shot is insufficient to defeat summary judgment in light of the overwhelming evidence to the contrary.

11

and an inventory was made. Defs' Reply Mem. of Law on Mot. for Summ. J., Ex. F. (Report of Special Agent Melissa Jefferies noting seizure and inventory of Raymes's weapon and ammunition). The gun had 1 25-round magazine with 22 .45 caliber bullets remaining in the gun. Mem. in Supp. Ex. F, Item # 1. The expert opinion, the medical records, and reports confirm that one three round burst was fired from Officer Raymes' gun. The medical records and affidavits specifically refute the argument that there was a single close range shot.[3] No excessive force was used by defendants and qualified immunity is proper. The claim is dismissed.

iv. Conspiracy

The remaining claim is one of conspiracy arising out of the excessive force claim. As previously stated, "[t]o establish a civil conspiracy, a plaintiff 'must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the plaintiff's] deprivation of a constitutional right.'" Hinkle v City of Clarksburg, W. Va., 81 F.3d 416, 421 (4th Cir. 1996) (holding no civil rights conspiracy in a 42 U.S.C. § 1983 action). Having found that there was no constitutional infringement of plaintiff's rights to be free of excessive force, there is no conspiracy therefrom. The claim is dismissed.

---

[3]In the response letter, Britt argues that there was no gunpowder residue on his body because the medics washed or cleaned the area. Thus, he asserts the fact that no residue was found does not support the assertion that no close range shot was fired. Taken as true, the court's analysis is unchanged in light of the evidence concerning Raymes's perception of threat, warning to Britt, the physical evidence at the scene, the testimony of the doctors, and opinion of the expert.

12

Conclusion

Accordingly, defendants' motion for summary judgment is GRANTED [D.E. 92]. The Clerk is DIRECTED to close the case.

SO ORDERED, this the _14_ day of March 2013.

*Terrence Boyle*
TERRENCE W. BOYLE
United States District Judge